LILLIAN M. GLOVER *vs.* SEYMOUR GLOVER.

Middlesex.   March 17, 1913. — October 22, 1913.

Present: RUGG, C. J., MORTON, LORING, SHELDON, & DE COURCY, JJ.

*Widow,* Allowance.   *Probate Court,* Appeal.

An allowance made to a widow under the provisions of R. L. c. 140, § 2, should not exceed an amount sufficient to provide for the necessities of the widow for such a period after the death of her husband as will give her an opportunity to adjust herself to her new situation.

On an appeal from a decree of a single justice of this court allowing a widow under the provisions of R. L. c. 140, § 2, upon her petition filed a year and ten months after her husband's death, the sum of $1,500, it was *held,* after a review of the evidence and giving to the petitioner the benefit of the most favorable inference to be drawn from it, that $500 was a sum sufficient to provide for her necessities.

PETITION for a widow's allowance, filed in the Probate Court on September 22, 1911, by the widow of Clarence F. Glover, late of Waltham, who died on November 20, 1909, and whose will was allowed on December 22, 1911.

In the Probate Court the petition was heard by *McIntire,* J., who made a decree allowing the petitioner $2,500.

On appeal by Seymour Glover, a beneficiary under the will

of Clarence F. Glover, the case was heard by *Braley, J.,* a commissioner having been appointed to take the evidence, and a decree was made remanding the case to the Probate Court with directions to modify the decree so as to allow the widow $1,500. Seymour Glover appealed.

Other material facts are stated in the opinion.

*E. R. Anderson,* (*G. A. Sweetser* with him,) for the respondent.

*J. F. Lynch,* for the petitioner.

LORING, J. This is an appeal from a decree granting to the petitioner a widow's allowance in the sum of $1,500. The case is before us on the evidence introduced before the single justice who made the decree, excepting however that the exhibits introduced in evidence before him have not been printed. The evidence is far from satisfactory. It leaves in a state of confusion the facts on which the questions of the petitioner's right to an allowance and of the amount of it depend. The appellee has not objected to the failure to print the exhibits, and we take the case as it is presented to us without objection on the part of either party.

The law governing the questions which we have to decide is settled. In *Dale* v. *Hanover National Bank,* 155 Mass. 141, Knowlton, J., said that an allowance, if made, is to be made "to provide for the necessities of the widow and minor children for a short time, until they have an opportunity to adjust themselves to their new situation." In *Chase* v. *Webster,* 168 Mass. 228, 231, Barker, J., said: "It is a question of the widow's actual necessities." It was held in *Porter* v. *Porter,* 165 Mass. 157, that although the widow was in necessitous circumstances and did not have proper clothing and was $100 in debt, two years and four months after the husband's death a second widow's allowance could not be made. Allen, J., in delivering the opinion of this court in that case, said, at p. 159: "The allowance is to be made in view of the condition of things at or immediately after the death of her husband." But it was held in *Lisk* v. *Lisk,* 155 Mass. 153, that an allowance could be made where the petition for an allowance was filed by the widow two years and eight months after the husband's death; and Knowlton, J., in delivering the opinion of the court in that case said, at p. 154: "It has never been held that, because the necessities of a widow have been relieved through

the charity of friends, or in some other way outside of herself, she is deprived of the right given her by the statute to have them provided for by an allowance in the Probate Court, so long as there is personal estate undistributed in the hands of the executor or administrator. An application for a widow's allowance ought to be made at an early stage of the proceedings before the Probate Court, and it ought not to be granted if it comes so late that the granting of it will cause embarrassment or difficulty in the settlement of the estate. Indeed, ordinarily the occasion for it ceases to exist within a short time after the appointment of the executor or administrator. But if a widow has borrowed money for the relief of her necessities, or received it through charity, there is no reason why the means of repaying it should not be furnished her by an allowance out of her husband's estate, to the same extent as if she had applied for the allowance before she obtained the means of relief." To the same effect see *Welch* v. *Welch,* 181 Mass. 37.

It is of course the rule that the decree of the single justice is not to be overturned unless it is plainly wrong.

Clarence Glover, the husband of the petitioner, died on November 20, 1909. The petition now before us was filed a year and ten months later (on September 22, 1911), and the hearing before the single justice apparently was in July, 1912, two years and seven months after the husband's death. It is important to bear this in mind because much of the evidence introduced before the single justice showed the actual necessities of the petitioner at that time (two years and seven months after the husband's death) in place of her actual necessities "at or immediately after the death of her husband." There were no children of the marriage. The petitioner waived the provisions made for her in her husband's will, and thus became entitled to $5,000 and half of the remaining personal property and of the remaining real estate. R. L. c. 140, § 3, cl. 3, as amended by St. 1905, c. 256. *Walden* v. *Walden,* 213 Mass. 418.

It appears that the petitioner came to this country in 1900 or thereabouts, and that she then could not either read or write. We assume that she could do both at the date of her husband's death. It appeared that she had not kept any account of her receipts and expenditures, and in answer to this question put to

her by her own counsel, "You don't keep any books for the property you claim to own?" she testified: "My education is so limited I could not tell one thing from another; I keep my own figures. . . . I have it in my head."

At the time of her husband's death the petitioner owned three houses, all in Waltham, one on Main Street, one on Orange Street, and one on Clark Lane which was subject to a mortgage of $500. The house on Main Street had twelve rooms and was the house in which the petitioner and her husband were living at the time of his death. The petitioner continued to live in this house until May, 1912, *i. e.*, for two years and five months after her husband's death. At the time of the hearing the petitioner was "charging $25 a month" for this house.

The Clark Lane property was rented for $30 a month until November 1, 1911, *i. e.*, for two years after the death of the husband.

The Orange Street property was a four tenement building. All the tenements had been let from the death of the husband until September, 1911, a year and ten months after the death of her husband. The monthly rent of all four tenements was $66. At some time not disclosed in the evidence a tenant moved out of one of these four tenements owing the petitioner fourteen months' rent, at $17 a month.

To sum up the facts as to the petitioner's real estate: For two years and five months she lived in a house which let for $25 a month, or $300 a year, and she was in receipt of a gross income from the other two of $96 a month, or $1,152 a year subject to the loss of $238 rent at some period not disclosed in the evidence. The petitioner testified without objection that she figured up that she received from these three pieces of real estate from the death of her husband "to the present time, the first of July," 1912, $2,790, and had paid out $2,355.82. At the time of her husband's death the petitioner had $4,300 in the bank, and in January following her husband's death she received $1,990 under a policy of insurance on her husband's life. This she kept for two or three months and then put it in the bank.

The husband left real estate appraised at $5,500, and personalty appraised at $33,205.64. Of this personalty, appraised at $33,205.64, the petitioner contended that she owned property

amounting to $21,300, consisting of one hundred and ninety-eight shares of stock in a laundry corporation taken at par, and an automobile appraised at $1,500. Of the remaining personalty appraised as belonging to her husband's estate (amounting to $11,905.64), $8,150 was the appraised value of sixty shares of American Telephone and Telegraph Company, and $3,755.64 was the value of personalty the nature of which was not disclosed in the evidence. As a widow's allowance takes precedence of debts, the claims against the husband's estate, although of some, are not of vital importance. The executor testified that a claim had been put in for expenses of administration down to the appointment of the executor, amounting to $8,051.08, not including some additional legal services incurred by the estate in litigation against it begun by the petitioner. Of this $8,051.08 the sum of $4,650 was a charge made by the executor for his services, and beyond that it did not appear what the $8,051.08 consisted of or how it was made up. In addition there was a claim against the estate on a note for $6,000 held by a brother of the petitioner and claims held by other persons amounting to $1,557.98.

When asked what her style of living was "during the few months" before her husband's death, the petitioner testified: "Why, we had an automobile, we travelled, we had a horse and team, we had dogs. We travelled a great deal, and I had a maid and we had a man to take care of the grounds; off and on I had a gardener and a chauffeur part of the time. . . . We spent about five or six hundred dollars, perhaps over, perhaps less" a month. "When we travelled of course we spent a great deal more money. We went to Jamaica, which was a very expensive trip; and we went to the Thousand Islands, and of course that was expensive. Then we took trips to the beaches sometimes and to the theatres once or twice a week, and we always had swell dinners." And she testified in effect that the money for these expenditures came from "my laundry." She further testified, when asked what her style of living had been since her husband's death: "Very poorly; I have lived in the kitchen; I had no coal to burn in the furnace; I bought two tons last winter; I had no money to buy coal with. I had no man to do things around the house; I had to do all the work of cooking and everything else. And I have had no dogs,

no horse, no automobile — I have got nothing; half the time I have had no food. I have borrowed the dress on my back; I have $1.15 hat, and I paid $1 at Raymond's for these slippers I have on, and that is the way I am living today."

There are hints here and there through the evidence of litigation in addition to the litigation begun by the petitioner against the estate. The petitioner testified that she handed the $4,300 cash which she had on hand at her husband's death to Mr. Elmore, who it appeared was an attorney at law and executor of her husband's will. She testified however that it was not handed to him as executor and that she gave it to Mr. Elmore because "he said he had to get some money because the Glover brothers were crooks, and they would do a lot of bad things if he didn't get the money from me." Mr. Elmore was a witness in the case, but no explanation of this was given by him.

In view of the amount allowed by the single justice the view of the evidence should be taken which is most favorable to the petitioner. Although that view of the evidence is to be taken, there are some aspects of it which must be considered. Manifestly the petitioner was not a person of social standing, a fact referred to in *Dale* v. *Hanover National Bank*, 155 Mass. 141, as of some importance. Her account of "her style of living since her husband's death" related in the main to a period long after that which is to be considered in determining the granting of a widow's allowance, viz., the time "at or immediately after the death of her husband." And the summary of the receipts from and expenditures upon her three houses for two years and five months succeeding her husband's death is open to the same objection. In view of the other evidence as to these parcels of real estate and of her inability and failure to keep any books of account, the accuracy of these figures is open to doubt.

Giving to the petitioner the benefit of the most favorable inference to be drawn from the evidence, we are of opinion that under all the circumstances of this case $500 is as large an allowance as properly can be made. The decree of the Probate Court must be modified so as to give her that sum.

*Decree accordingly.*